First case on our call this morning are the consolidated cases numbered 105-789 and 105-851. Agenda number 10, Hector Adams v. Michael Sheahan. Counsel, you may proceed. Good morning, Your Honors. It's a distinct pleasure to be in front of you today. My name is Terrence Gillay. I'm an attorney for Michael Sheahan in his official capacity as Cook County Sheriff. By the order of the court, I will grant our, I will do our argument for 10 minutes. My co-counsel, Dan Gallagher, will handle our rebuttal. If I can, Counsel, you understand you're in charge of that time, not me? Yes, Your Honor. Thank you. The issues in this appeal, if it pleases the court, is whether we can hold the Sheriff's Office and other municipal police agencies liable for any improper access and use of an officer's duty weapon by a third party for which there was no control. Moreover, the issue is whether we will allow this liability to occur as a result of the very existence of detailed and proper training programs on safe home gun storage against the police agencies. It is our position, respectfully, that to hold the Sheriff liable in this case is to make Illinois taxpayers insurers for each and every improper use of a duty firearm that, for whatever reason, makes its way to an unauthorized user. In light of the past decisions of this court finding that alleged actions of gun dealers and distributors selling guns into poor areas of Chicago were not a proximate cause of the injuries and deaths complained of, it seems to us to not be logical to hold the Sheriff liable under the facts of this case. Now, the plaintiffs in this case, the appellees, have tried to assert liability against the Sheriff based on, under the theory of respondeat superior. The main issue in that, and the issue in our appeal, is what about the use of the gun served the purposes of the Sheriff? Mere possession of a tool, a tool of one's trade, should not be the hinge for liability under respondeat superior. There should be some use of that tool in the service of the master, serving the master's mission that supports the liability. Now here, the Sheriff, because of the clear general foreseeability that improper storage of guns is a dangerous thing, trained on storage. The mandate of the Sheriff's office were that guns should be completely inaccessible. Now, that obviously didn't happen here, and that's why we're here today. Now, one of the cases that's in the materials is the Gaffney case. There is a Chicago Police Department officer who, by his testimony that he had to respond to emergencies on a 24-7 basis, was part of his reason for having his gun accessible. In effect, the mode of storage of the gun was to serve his master to respond to emergencies. The facts in this case are clear and undisputed that a Sheriff's lieutenant, such as David Swan in this case, one, does not bring his gun to the jail. He doesn't use it in his day-to-day job. Two, he had not touched his gun in nearly a year. And three, the storage of the gun was supposed to be inaccessible. There was nothing about the Sheriff's mandate or the Sheriff's mission that led to the storage of this gun being accessible. It was quite the opposite. Well, I think as a matter of due safety, the Sheriff has detailed training programs. He's still more than an ordinary citizen at that point, then why not impose the same restrictions on all citizens? He doesn't have the power, I understand that. Right. Well, officers and all Illinois Municipal Police Agencies need to use weapons. So it's reasonable to have restrictions for the Sheriffs to mandate how those guns are used. Now here, the instruction was that the gun be inaccessible, that it be properly stored. There was nothing about the mode and the expectations of the Sheriff's office that the gun be accessible. So the common sense of issuing regulations, in effect, is what's being turned around against the Sheriff's office. Because you took proper safety actions. Counsel, is there evidence in the record to suggest either the gun was or was not in the locked box in the closet? Well, the facts are clear in this respect. The gun was in a gun case. It is disputed for purposes of the record whether that case was locked. Now, David Swan has testified that about a year prior, the last time he had the gun at the range, he locked the gun box with his two other guns, his personal weapons, brought them home, put them in his closet up on the shelf, and it was locked and up there. Now, Billy Swan has testified that the gun box was unlocked. For purposes of summary judgment, obviously, we're working under that. Unlocked? And where did the youngsters say the gun was? Did they say it was in the closet or on the bed? Well, the gun was in the box, up on a shelf in the closet. It was clearly, it was in a bedroom that was, Billy Swan was instructed not to go into the parents' bedroom. It was the one part of the house that David Swan felt was the safest place to store the weapon. The gun was unloaded. We don't know where Billy Swan got the bullets. They were in a black pouch somewhere. The record's unclear as to where they were, but the gun was unloaded. Now, the gun, the Beretta had a magazine clip in it, but it was unloaded. Now, it was with two other weapons that David Swan had. One of the things is, after this event, David Swan had his guns taken away from him by the Chicago Police Department. He does not have them to this day, yet he continues his work with the sheriff's office for quite some time after that, because his job duties did not require him to use a weapon. Counsel, regardless of the disputed facts relating to the box being locked or not locked, and even separate and aside from the respondeat superior theory, does the plaintiff's case hinge on the fact that they're disputing whether this was a criminal act committed by Billy Swan or not? Well, I don't think we need to get to, really have to decide the issue of whether there was a criminal conviction. We can look at Billy Swan's testimony, and I think it's important that this court has said that under the Juvenile Justice Act, the proceedings and adjudications there are akin to a criminal proceeding. Billy Swan was found guilty by the juvenile court judge of involuntary manslaughter and discharge of a firearm. We believe it was a criminal act. We believe that if you look at his actions that were in the record, both from Billy Swan's testimony, and as well as the adjudication that is of record in this matter, that it was a criminal act. But the actions were reckless. I mean, this kind of gets us into the proximate cause argument that we also raise in our brief, that at the end of the day, this gun is sitting in a closed box, in a closet, in an area where Billy Swan was not supposed to go. It was inert. The gun could not harm anybody until Billy Swan acted on that. Now, I think as a policy reason, this case should not turn on the age of Billy Swan. It should turn on what he knew. He knew this was a real gun. He knew this was live ammo. He knew he was loading it. He knew that he could hurt or kill somebody with this gun. And tragically, that's what happened. So we have interceding actions by Billy Swan that caused this death. Am I correct that the trial court granted summary judgment on the ground that there was no duty to protect Josh from Billy Swan's criminal acts? In part, that was a basis of the trial court's holding. But it was also looking at the actions of Billy Swan as being the proximate cause of the action. In addition to that, you had the juvenile adjudication, certainly. So do I understand your argument that it doesn't need to be a criminal act for you to prevail, but you agree with the trial court that if it was a criminal act, there's no duty? Yes, yes, exactly. I think in both layers, we can look at Billy Swan's actions and the recklessness of those actions, the knowing actions that he took, as well as the fact that the juvenile court judge found that this was a violation of Illinois criminal statutes for involuntary manslaughter and reckless discharge of a firearm. One focus that we have to get back to is what was the intent of the employee under Respondiat Superior? David Swan had no intent that he was serving the mission of the sheriff if it is accepted for purposes of the record that the gun was accessible. We disputed that. We don't believe that the lockbox was unlocked. But with that there, David Swan was not doing anything in leaving that gun accessible that served the sheriff. All it did is lead to us being here today being sued. He knew and understood that his training was that that gun should be inaccessible. The very fact of what David Swan did itself is a criminal act. In order to hold the sheriff liable, at the end of the day, plaintiffs keep coming back that the sheriff trained on these things. We think it's punitive and improper for the sheriff to be faulted for those actions and would be a bad signal from this court to Illinois municipal police agencies throughout the state. If training is something that is going to connote a general foreseeability and then liability for all the specific things that happen underneath of that, it questions whether there should be training. The fact of the matter is, officers need guns. Employees, carpenters need tools. The possession of a tool itself is not enough for responding to that superior. You're really arguing that the appellate court's opinion is overburdened on the sheriff's office? Absolutely. Well, how much of a burden would it create if the sheriff just ordered the deputies not to take weapons home since they're not 24-7? If they had weapons, it's just like any other citizens can go out and buy a personal weapon and keep it at home. Well, the burden would be multifold. One, all the municipal police agencies would have to incur the expense of having safe storage facilities. Wherever their offices are, whether it be a police agency at the jail and so forth. What you're saying is that he had the option of having no burden on his office by simply ordering the officers not to take their service weapons home? Well, then the guns have to go somewhere. So at the first level, you would have to have a place at their place of employment where to put those guns. Secondary, to the extent that other municipal police agencies, officers may be very remote from their office. Where they have to go all the way to the police station and then back to get their gun to go back out to where the travel issues would be very burdensome. I see I'm over my time. I may have pleased the court. My name is Craig Livingston. I'm pleased this morning to represent Breda USA in connection with this appeal. On in October 2005, some two months after the trial court granted summary judgment in this case, Congress passed the Protection of Lawful Commerce in Arms Act, which has as its purpose to protect firearm manufacturers and distributors from lawsuits, which seek money damages for harm caused by the misuse of firearms, which function as designed and intended. This case is precisely the kind of case Congress sought to prevent. The PLCAA, as I'll refer to it, protects manufacturers and distributors like Breda by prohibiting the bringing of qualified civil liability actions and by requiring the immediate dismissal of those actions in any court in which they are currently pending. Could you give me an example of any kind of lawsuit that this enactment would not protect a gun manufacturer from? It would not protect a manufacturer from a lawsuit in which there had been an accident, a pistol or a firearm is dropped and shoots somebody, where it is purely an accident. It does not include volitional conduct that constitutes a criminal offense of some sort. So a purely accidental lawsuit or a purely accidental action would not protect a manufacturer from that. It would certainly survive a challenge under the PLCAA. But Congress made it very clear that a qualified civil liability action is an action. Are weapons supposed to discharge if they're dropped? They're not supposed to discharge if they're dropped. And so it would be potentially a manufacturing defect. There may be situations in which negligence does result in a discharge, but the exceptions under the Product Liability Exception of the Act refer specifically to allegations in which there's a defect in design or a defect in manufacture. So the example that I gave could potentially involve a defect in the manufacture of a firearm that discharged when it shouldn't have when it was dropped or when some other handling of the firearm occurred. So manufacturing defects would certainly survive by the express language of the statute, as would certain design defects. Provided, however, that the discharge did not result from a volitional act or volitional conduct in the manufacture of a firearm. That constituted a criminal offense, and that is the Product Liability Exception. In this case, though, a qualified civil liability action includes criminal or unlawful misuse of a qualified product. And there is no dispute at all that this is a qualified product, that Beretta is a distributor and manufacturer of firearms and therefore comes under the protection of the PLCAA. There's no dispute that the action was of a third party, Billy Swan. The undisputed facts surrounding Billy's actions can lead to no other conclusion but that his actions were at least unlawful under the Act, even if we set aside for the moment whether or not they were criminal. There were several violations of ordinances or possession statutes that were cited in our papers, one of which includes a discharge, an alleged discharge of a firearm. An unlawful discharge of a firearm within the city limits of Chicago. A federal possession, minor in possession charge, as well as an Illinois possession charge in connection with Billy Swan not having a firearm owner's identification card. All three of these things are conduct which the undisputed facts in the record clearly demonstrate Billy Swan violated. Again, without even getting to whether or not there was a criminal conviction, whether or not we even get to involuntary manslaughter or reckless discharge of a firearm, there are these unlawful acts which are the result of his volitional conduct that make the product liability exception inapplicable. Now, unlawful misuse is defined as conduct that violates a statute, ordinance, or regulation. And again, that can include things like discharge within a city limits, possession charges, or handling. Because the unlawful or not, how do you address plaintiff's argument that Billy Swan was 13 at the time of these unlawful acts and horseplay is foreseeable? Well, he was 13 years old at the time, correct. But if you look at the undisputed facts in the record, his conduct was such that he knew exactly what he was doing. He knew that he was handling a real firearm. He knew that he was handling real ammunition. He knew that he was loading and unloading that real ammunition in a real firearm. He knew that that firearm had the ability to kill or injure someone. He knew he was not supposed to be doing what he was doing. All of these things, taken in their totality, demonstrate that Billy... Would you include one more fact in your analysis, and that's, I think, the fact in this case, that the youngster did not believe that the gun would fire at the time the killing took place. He did not... He believed that he had unloaded the firearm, that's correct. However, he knew he had enough information, just in the way he was handling that firearm, to have prevented this accident in any number of ways. And if we just... I see I'm running out of time, but if we briefly move to the warnings issues... He, of course, did not see the instruction manual, had not read that instruction manual. But he certainly knew that he was handling a real firearm and could have avoided this accident in any number of ways. And there are a number of ways in the instruction manual in which this accident could have been avoided. There are a number of general safe handling instructions that are right on the front page of the manual. There were a number of instructions that explained to anyone who bothered to read it how to completely unload the firearm. The warnings issues that the appellate court allowed to go forward relate to whether or not the warnings were sufficient to warn a user or someone who read the manual, whether or not the pistol would fire if the magazine were removed. But I think that that actually doesn't correctly frame the question. The question is whether or not the manual would have provided Billy with enough information to know that he had completely unloaded the firearm. And on that point, the appellate court was very clear and found that there were explicit, repeated instructions, to use a court of appeals words, as to how to completely unload the firearm. There were a number of places in the manual in which the user was instructed to remove the magazine, first put the pistol on safe, remove the magazine, and then completely unload the firearm. If you follow any of those steps, I'm sorry. Was Billy a foreseeable user? I don't believe he was. He's a minor, a 13-year-old. This is clearly, as a court of appeal held, clearly an adult product intended only for adults. He could not legally purchase it. He could not legally possess it. And I don't believe that he was a foreseeable user of this product. And if not foreseeable, and he had all the necessary... He knew certain things. And why was the warning even necessary for him? Well, I don't believe that a warning was necessary for that, Your Honor. I don't believe that there was a duty on the part of... Well, we certainly did provide adequate instructions. However, I don't believe that there was a duty on Beretta to advise of open and obvious dangers of pointing a firearm at another human being and pulling the trigger. Beretta, nonetheless, did provide a number of warnings as to safe handling, how to thoroughly unload the firearm, et cetera. But under the law in Illinois, I don't believe that there is a duty on the part of Beretta to warn of the open and obvious dangers of the conduct that Billy engaged in. And I see I'm done with my time. Thank you very much. Good morning, Your Honors. My name is Michael Rasek on behalf of the plaintiffs at Belize. The Adonis family were also here seeking cross-relief with respect to that part of the summary judgment that was not reversed by the appellate court. Can we talk just about that for just a second, Mr. Rasek, just to make sure that we're on the same page here? The appellate court reversed the summary judgment as it pertained to Sheehan, right? That's correct. And the appellate court reversed as it pertained to the failure to warn claim for Beretta? That's correct. It allows us to proceed on the product liability claim against Beretta for failure to put two different warnings on the gun. All right. And as far as the act goes, the Protection of Lawful Commerce Act, was that addressed even in the trial court? No, it was not, because that statute did not come into play until after the case was actually on appeal. But at any rate, the appellate court found a question of fact, so that is still a viable claim for the plaintiff, right? Yes, it is. So your cross-relief then only pertains to the appellate court affirm the trial court as to the gun not being unreasonably dangerous under the consumer expectation test? Correct, or the risk utility test. The appellate court said it was not unreasonably dangerous either under consumer expectation or risk utility test. I didn't want to take too much of your time. As we're there, I'm going to start right at that point. The appellate court found that it was not unreasonably dangerous primarily because they thought that this was a military or police weapon and that therefore the standard to look at to determine whether or not the way it was designed, that is, without having a magazine disconnect that prevents it from shooting if you take the magazine out, was something that wasn't needed. The appellate court seemed to think that this was a weapon just made for the military, made for the police, made according to some sort of special specifications, whereas in fact the breadth of people admitted this was a commercially available weapon. David Swan, the person involved, bought this at a gun store. This is not something that the sheriff ordered in terms of specifications. So the premise for the appellate court's finding that the gun was simply not unreasonably dangerous does not exist. If I can then go back to the sheriff's argument for a moment. The sheriff's first argument to this court was that respondeat superior did not apply. And I would like to point out to the court that the trial court found there was a question of fact as to respondeat superior, that is, whether or not the sheriff could even be liable under respondeat superior. Therefore, that issue was not even briefed in the appellate court. The appellate court devoted a part of its opinion to whether or not respondeat superior existed. It wasn't an issue. And if the court looks at the sheriff's points relied upon for appeal to this court, respondeat superior is not there. Respondeat superior should not be an issue that this court addresses. There was a question of whether or not the bullets were with the gun. At page, I believe it's page 5788 of the record, David Swan said he stored the bullets in the clip with the gun. The gun, of course, was in an unlocked box in a closet in the bedroom. Now, the sheriff's and, in part, Beretta's position, I think, comes down to pretty much this question of foreseeability and the foreseeability as it relates to this being what they call a criminal act. The foreseeability issues, I think, are governed in part by the various cases we've cited, which say, where the courts have all said it's very foreseeable that if you have a gun, you can use it. The Pennsylvania court in Coons, I think, it's almost a magnetic attraction. You know that if children see guns, they're going to use guns, right or wrong, no matter what rules you have, you're going to do it. It's foreseeable that you'll have this result. We know that this is going to occur because the whole reason for the sheriff's rules creating proper storage for these weapons is because you know that this kind of thing can happen. It happens 300 times a year, according to the statistics, and those are deaths alone of children used by accidental shootings with guns. Whether or not this is a criminal act is important both for use of the federal immunity statute, the federal bar statute, and for the sheriff's argument that it's not foreseeable. And the plaintiff's position here is that Billy was found or rather adjudicated a delinquent under the Juvenile Court Act. There was not a criminal, there cannot be a criminal act involved. He was not convicted of a criminal act because you cannot convict somebody of a criminal act if you're a juvenile and you're proceeding under the Juvenile Court Act. This court in Taylor, only two years ago, noted that we've changed the Juvenile Court Act and we've surely made juvenile conduct in the courts more like criminal conduct, but the bottom line is that this court said it's still not a conviction, it's not a criminal act. And if it's not a criminal act, then their foreseeability act, their foreseeability argument is invalid. If the, even if the proceedings are not criminal in nature, does that negate the criminal nature of the child's underlying conduct? That's our position because then this court would in effect be saying, would be saying he did in fact commit a criminal act, whereas ironically he's not been convicted. He was adjudicated the delinquent. You have a court on the one hand saying we cannot find you criminal and this court would be saying yes, but we can't call you criminal for purposes of this. And if I can point to the court's attention, the statute that he was found adjudicated delinquent on doesn't even require unlawful conduct. The involuntary manslaughter statute means that you can be found guilty, if you will, for lawful conduct that is reckless. That's right, those are the words of the statute. That actually surprised me when I read it. There's no mens rea, there's no criminal intent around if you're reckless, you can be found, you can be adjudicated delinquent or found guilty if you're an adult. So you have a situation here where you have this young man who believes, and I think this is so crucial, and it seems clear to me it's not clear to the opposing counsel. He thought he had made this weapon impossible to fire. He did not just think it was unloaded, which is a premise for some of the other adult cases where people fire guns not knowing they're loaded. He did what he thought, and apparently what a good part of the population thinks, and what the guns marine marksman owner thought would happen when you pull the magazine out. When you take the magazine out, Billy and his father and about 30% of the population think you can no longer fire the weapon. And that's because they think that the bullet that's fired is the one at the top of the clip. That somehow the clip is up and that that is the bullet that's fired and then the next bullet is fired. They don't realize that the bullet goes from the clip into the chamber and then from the chamber gets ejected. That's hardly a surprising or unreasonable thing for, Beretta knows that. Beretta knows that this is a problem. It's been known since 1910 when John Browning patented the invention, the magazine disconnect. It prevents the gun from firing with the magazine out because this happens all the time. People don't realize or forget there's a round in the chamber. Mr. Rastak, you seem to argue or use the word criminal conviction while the defendants, I think, are concentrating on the language of the act which says that the discharge is caused by a volitional act that constituted a criminal offense. I think their argument is that involuntary manslaughter constitutes a criminal offense, and therefore if there was any volition involved, they're accepted. Yes, and that's why I have to distinguish. The sheriff's argument, of course, is just based upon the conviction itself. Beretta's argument is based upon the federal statute, the Protection for Lawful Commerce in Arms Act. The federal statute which bars actions against gun manufacturers was intended, and I can start with this, if I might, it was intended in its preamble, and you can also tell it was intended because of the words of the people who spoke about it in the legislature when it was acted. It was intended to bar specifically kinds of cases not brought in 100 years. They were talking about barring the nuisance cases that the cities were beginning to bring against gun manufacturers. In the city of Gary case that we cited, Beretta was part of the group of manufacturers there which said that was precisely the type of conduct that this act was looking to bar, the nuisance cases, the theory that the gun manufacturers, by making so many guns, knew that they were going to end up in criminal hands and kill somebody. And then in the amicus in support of my side, Mr. Shen, who was the general counsel of the city, the general counsel for one of the manufacturers, in looking at the same language that's used in this statute that excludes certain things from its enforcement, talked about or said what we're trying to do is retain the right to the common law action, the negligence actions, the product liability actions. And then there's an exception to that exclusion for a criminal offense. And that's a long way around to say, and I appreciate John's patience with that. I know it's the only way I can answer this question. What I'm suggesting to the court is that if we look at what the scope of the statute was intended to really block, and we look at what seems to be, what's a stated intent to not bar common law actions, when they use the word criminal at that point, a criminal offense, I would suggest to the court that it's well within this court's discretion to interpret that phrase, to talk about what would normally be considered a criminal act, a mens rea, something where I intend to do it, not an offense that falls underneath our involuntary manslaughter statute, where he was adjudicated a delinquent and where he did not have to commit an unlawful act. Mr. Rasek, I appreciate and understand your nuances on that. Do you agree with the proposition of the trial court when they granted summary judgment in favor of Shane that Shane did not have a duty to protect Josh from Billy's criminal acts? And then let me just go one step further. And then in the appellate court, I believe they held if Billy's actions were criminal, the act would foreclose plaintiff's claims against Beretta. So my question is similar to the one that I had for opposing counsel, and that is if this court finds this to be a criminal act and disagrees with the nuance, and the mens rea argument that you just eloquently made, I mean, is that the decisive factor? No, it is not at all. And, again, I have to split the two things up. If this court decides it's a criminal offense, then the plaintiff has a difficulty with the Protection for Lawful Commerce and Arms Act. But with respect to the sheriff, though, criminal conduct is foreseeable. That's the Burgoyne-Burgoyne case. That's the Elliott case that we've suggested. And if this conduct is going to be deemed criminal, I suggest that this is specifically the kind of conduct that's foreseeable to the sheriff. We know it was foreseeable to the sheriff because that's why the sheriff put his rules into place to try and prevent this from happening. And if you have criminal conduct that's foreseeable, at least up until this point, then the question is whether or not you can still owe a duty. And I believe the cases say if you can foresee the criminal conduct, and the criminal conduct is intertwined, is the word I would use, with the whole event, it's foreseeable, and if it's foreseeable, then you have legal causal relationship, you have proximate cause. This is not a situation where somebody stole a gun from someone's house and then used it in a holdup someplace. That case is so different because there they took possession of the weapon and they intended to use the weapon in the criminal act. This is just not that case. He did not take possession of this weapon. This young man was not in violation of a possession statute, and I say that because possession requires that you want to keep it. He didn't take this weapon to own it. It was just there. If the defense is right in that he committed a criminal offense with possession, that means as soon as I don't have a firearms owner's identification card and I go in the hallway and one of the police for some reason shows me his weapon, as soon as I touch it, I've committed a violation under there, and that's not what it's about. Possession should mean an attempt to keep it. He meant to use it, and he did not mean to use it as a firearm, which may be another reason for not enforcing the federal statute. It talks about use of the weapon. It provides immunities for certain uses of the weapon. He wasn't using the weapon. I can make that. I had to think that out. He wasn't using the weapon as a weapon. What he was doing, as far as he was concerned, was playing with it as if it was a plastic water pistol. He had done what many people think is a reasonable thing to do. He had disarmed it. If he had poured something down the barrel in his mind, it was no less undangerous. So if we get back to Justice Garmon's question on the warning required, if he's not the intended user, then why would warnings be required? Because he is a foreseeable user, and he is a reasonably foreseeable user. And the law has always been that you have to have the warning there to educate a reasonably foreseeable user. And it's an either or. All the product liability cases talk about intended or foreseeable use. His would put to the court as a foreseeable use. Were you finished? I'm not sure I answered the question, Your Honor, but that's the best I can do. To get back, you're saying that the act of pointing the gun and pulling the trigger, that's not using the gun? I understand Your Honor's position. I can anticipate this. He wasn't using it as a gun. He was using it as a toy. There's a difference between, and we're looking at a 13-year-old boy. I can only make this argument because I can do it from the perspective of a 13-year-old boy that everybody knows, the sheriff certainly knew, might have access to the gun. Beretta knew this happened all the time. We have somebody who's 13 years old who is, he was using it the same as if I pick this picture up, I guess I'm using it. It depends what I do with it. In this case, he thought it was inert. And if it's inert, then. But he knew it was a real gun. He knew it was a real gun. He knew he shouldn't have the gun. That's correct. But he also thought it was entirely harmless. He thought it was a toy. He was just as surprised if he picked up his friend's toy weapon and it had discharged the bullet. I'm asking the court to look at it from that perspective. And that's true with respect to the Federal Act as well. I think this court can reasonably find that he wasn't using it. The Federal Act, I believe, had in mind people who take guns and use them for criminal purposes. They go shoot somebody. They go hold somebody up. They weren't looking at a situation where if let's assume he took the weapon and if anybody's been in the military, it happens. You need to pound something in. He's using the weapon to pound it into the ground. Is that a use that's covered by the federal statute? I would submit not. I think the federal statute was intended to point to use as a firearm. He wasn't using it for that purpose. Is it in that perspective that we have to look at whether or not a warning would have done any good with respect to a 13-year-old in this particular instance? I have the advantage in this case of the 13-year-old being asked, and he specifically said, I looked at both sides of the weapon and all I could see was the name Beretta, which is about all that's there. And he was asked if it had said loaded, would it have made a difference? He said it could have. And one of our arguments on the warning issue is either that you need to put, and both can be done and both have been done across the country. You either put a warning that it can fire with the magazine out or on the top of the chamber. I can't bring the weapon into court, obviously, with security now. It says loaded. And he said he looked at it. So I think there's a whole legion of cases that say you cannot look and not see. I can use that and turn it in my favor here. If he looked, he would see. It would say loaded. And he would never have pulled the trigger. We all know that. Defense counsel knows that. Defense counsels, general counsel, everybody's agreed this was just a tragic accident. But the question is whether or not somebody's conduct contributed to cause that accident. And that conduct is the conduct of the deputy in not securing this weapon and the conduct of the manufacturer in not doing something that it has done. I'm talking Beretta, keeping in mind that Beretta settled another lawsuit back east. We've got that evidence in the record where they agreed that they would put a magazine disconnect or a warning on every weapon like this for the very reason that we've talked to this court about. So in terms of the warning, in terms of the product defect argument, we have a weapon that's defective, arguably. Can we consider that settlement for any purpose in this case? I'm asking that it be considered for purposes of notice to Beretta that, actually it's admission by Beretta, that you can in fact do both of these things. You can put a magazine disconnect on. You can in fact put the warning on. And it also, I'm trying to think how to phrase this. It also really is an admission by Beretta. Beretta's argument is we don't have to do these things because these are military weapons and police weapons. This kind of weapon, and there they did it. Actually, they say that it would be detrimental to the police function. Yes, they do. They put the release on. Thank you, Your Honor. That was a point brought up by the appellate court. The theory is that there may be a situation where a police officer would want to have the magazine out and yet have a round left in the chamber that he or she could fire. The problem with that is twofold. One, this weapon is a commercial weapon, not a police weapon. It's their own people admitted that. Two, there is no evidence whatsoever that that has ever been a factor, that the absence of a disconnect has ever been a threat to any officer. If Your Honors recall, General Counsel for Beretta asked Beretta's expert, do you have any evidence? We'd like to back this up. Our argument is that this is a good thing. We'd like to back this up, that magazine disconnects are bad things and not having a magazine disconnect is a good thing. And their expert said, I can't find anything. Mr. Resnick, you indicated earlier if this court finds that this was a criminal act, you'd have problems with the act as it relates to Beretta. That would only be to the unreasonably dangerous claim. Would that affect the duty to warn as well? I don't believe so. I would have a hard time putting that in words. I don't believe so. And the reason I hedged on it is because the statute uses the word criminal offense, and if the statute uses the word criminal offense, then the court's got to address that fact. And if this was a criminal act, I think the next step is, is this the kind of act that Congress meant to consider when it put those words in this very special statute? Right. And what I'm asking is, if we disagree again with that nuance, does that affect only the unreasonably dangerous claim or does it affect the duty to warn? Does the duty to warn cover under the act? Beretta's argument is that duty to warn is a separate creature, not covered by, I'm sorry. Beretta's argument is that the duty to warn is covered by the act. Because of the way the act is written, the act provides a bar and then provides exclusions. I always have to rethink that. There's an exclusion. The act does not apply when you have a defective weapon by design or by manufacture. And our position is that the exclusion contains within it the duty or the failure to put a warning on the weapon. So a design defect, a manufacturing defect, and a warning defect, they're all part of the same common law remedy that the act meant to let survive. And once they let that survive, then the question is whether or not there was a criminal offense here. And one of those, if I could call the Court's attention to the fact, early in the federal statute, they talk about preventing or about barring actions for criminal offenses or unlawful misuses. When they come to the exclusion, they leave out the word unlawful misuse. So the exclusion for which we are trying to take advantage has left out the words unlawful misuse. And those words are defined at the end of the federal statute. I think it's 79039. And unlawful misuse has got a curious definition. It's a use in violation of a statute regulating the gun. As I read it, unlawful misuse refers to me using a gun where the law says I cannot use a gun. It would specifically address the Firearm Owners Identification Act. So there's an exclusion for product liability in negligence cases. There's an exception to that exclusion that lets the act kick back in. But that exception specifically drops out unlawful use. And unlawful use is defined to mean the very things that Beretta talked to this Court about, possession of a weapon in violation of the law. It's a very curiously drafted statute that is the best I can do with the words of that language. Mr. Rathsack, getting back to Justice Thomas' question, I understand what Beretta is saying is that the PLCAA prohibits civil liability and qualifies civil liability actions, and that includes failure to warn claims. There are six exceptions to that. Correct. And within some of the exceptions, there are exclusions or exceptions. But none of those exceptions apply unless the failure to warn is a type of product defect. Is that your argument? Yes. I think I would have to answer it that way. That has to be an honest answer. That's our position. It's all together. Design defect, manufacturing defect, and warning defect are all part of the same beast. This Court has said in Whittle that warning is really very much akin to negligence, and the Olson case in Iowa that we cited said warning and design defect are really the same things. In fact, I think this Court in Blue equated design and warning as being part of the same. This Court in Blue looked to either a manufacturing defect where the product itself has got something wrong with it, or a design or warning defect, which in Blue this Court said constituted the second category. Unless the Court has further questions, we ask that the Court affirm those parts of the appellate court opinion that allowed this action to proceed and that the Court reverse that part of the decision below, which affirmed the summary judgment with respect to the basic product liability action itself, that is the design defect issue. Thank you. Good morning, Justices. My name is Daniel Gallagher. I'm also appearing on behalf of the Sheriff. I want to thank you for your time and for your consideration of this case. The plaintiff is asking this Court to impose liability on the Sheriff for acts of a third party over which the Sheriff had no control. It is asking further that it impose liability. The only way it could impose liability would be through finding a duty, and that duty would have to come through the respondeat superior. So that's why respondeat superior enters into this. With respect to the issue of whether the plaintiff or Billy Swan was convicted of a crime, it doesn't make any difference whether he was convicted. The criminality of his act is, in fact, complete. Just because he wasn't convicted doesn't remove or erase the criminality of Billy's act. Under the Involuntary Manslaughter Act statute, a person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts, whether lawful or unlawful, are such that are likely to cause the death and are done recklessly. There's no question that in this particular case what Billy Swan did was totally reckless and irresponsible. Should the Sheriff assume the duty to protect others in this situation by passing all the restrictions? No, I don't think so. I think that what he did at that point was he attempted to eliminate any foreseeability that there might be that a weapon could hurt somebody. He didn't assume any duty. How do you eliminate foreseeability? Well, reduce it or eliminate it by training it out. Training it out. So it wouldn't be foreseeable to the Sheriff after he did all these steps. And this was a rigorous training program. There's no question about this program, and it was done year after year. Every year, if someone had a weapon, they had to go to the range, they had to go through the safety program, they had to go through all the programs in order to certify. But the point is, even if this man had quit his job or had been fired, this still could have happened. There's nothing by imposing liability upon the Sheriff under these circumstances. That's not going to make anybody safer because the Sheriff did everything he possibly could to avoid this. The Sheriff himself did nothing that was negligent or improper, and to impose any liability on the Sheriff under these circumstances I think is unfair. With respect to Billy Swan himself, counsel said that he argued that Billy acted just as if he had a toy weapon. But Billy was 13 years old. And the fact is, Billy said he knew that he wasn't supposed to be in his parents' bedroom. Billy knew that he wasn't supposed to go near this gun. Billy knew that guns could kill. Billy knew this was a real gun. Billy knew that he loaded the gun, and Billy thought he unloaded the gun. So he knew this was a real weapon, and every 13-year-old knows that even if you have a toy weapon, if it discharges something, you never point it at anybody and pull the trigger. And, you know, what Billy did was he may not have intended to kill this young man, but he unintentionally killed him by doing a reckless act, which makes his conduct criminal. And under the circumstances it would be unfair to impose a burden on the Sheriff. The other part of this would be that this would extend liability to a point for all law enforcement agencies and liability for all employers whose tools of the trade might or could cause bodily harm or death. The other thing, to say if the Sheriff's diligence in creating a rigorous safety program for handling storage of firearms is seen as creating a non-delegable duty to protect against the act of third persons, there will be no incentive for any public entity or any employer to have a safety program or a training program because it will be used against them and turned against them and said, well, then you could foresee that someone would take the hammer from your carpenter's toolbox and hit someone in the head with it or use it as a weapon. Opening the door will without question impact public entities, but it will also in the end impact the general public who will have to pay for any liability judgments against the public entities and the Sheriff. It's not that the estate of Joshua Adamus didn't have a remedy. They had a remedy. They had a remedy against David Swan, the homeowner, and the owner of the weapon. But liability shouldn't be extended to the Sheriff. Again, extending liability to the Sheriff does not make anyone safer or serve to prevent a tragedy like this from happening again. That is because there was really nothing more than the Sheriff could have done in a reasonable sense. In this case, he warned, he trained, and he disciplined. He sought discipline against Mr. Swan for not storing the weapon appropriately. It would be inappropriate and unfair to impose liability on the Sheriff, and since his actions were neither the cause in fact, Sheriff's actions were not the cause in fact, nor should they be the legal cause of the death of Joshua Adamus. Thank you very much. Thank you, Mr. Gallagher. Kate. Thank you. Just a few points that Mr. Rassak raised I'd like to discuss briefly, and I'll start with the product liability exception and whether or not failure to warn claims are included. The product liability exception is significant for what it says and for what it doesn't say. It does say that defects in design and manufacture provide potential exceptions under the product liability exception, in other words, the exception to the exception, but conspicuous by its absence is any reference to failure to warn claims. Failure to warn claims are universally considered a separate and distinct theory of strict liability. Here in Illinois and elsewhere, it's very clear there are design defects, several theories to prove that, manufacturing defects, and failure to warn. The plain language of the PLCAA does not include failure to warn claims. However, even if it did, the fact that there is clear volitional conduct on the part of Billy Swan that constituted a criminal offense, not a criminal conviction, the statute says only that the volitional act must constitute a criminal offense, and because that occurred in this case, it is then considered to be the sole proximate cause of the injury. Here it's undisputed Billy's volitional conduct by virtue of his own testimony that we cited in our briefs, by virtue of the plaintiff's expert who conceded in his deposition that Billy's conduct was volitional, as well as case law here in Illinois, including Taylor v. Jerry's Ridgewood and a case, a recent case that we cited from Pennsylvania, the Watkins case, which is on all fours with this case in which volitional conduct is found by virtue of the user going through all the necessary physical steps to operate the gun, even if it was unintended that it discharge. The PLCAA is not limited to municipal liability suits, and all you need to do is go to the findings to see several findings in which there is no reference at all to municipal cases, but in fact reference to lawsuits, lawsuits being commenced against manufacturers. That's section 7901A3. 7901A5 also discusses lawsuits against manufacturers for criminal and unlawful misuse. There's no reference at all to municipal liability litigation. While there are several findings that do make reference to those kinds of cases, the plain language of a number of findings and several of the purposes have no such limitation. With respect to the statistics that Mr. Rasak cited, the study, the one study that's in the record that relates to this issue is flawed, largely because the 1,200 respondents that Mr. Tarrant made reference to in his own words was a representative sample of the United States population. It was not a focus on purchasers of semi-automatic pistols, and when we focus on the universe of consumers, we must focus, as the Court of Appeal found, on that universe. In addition, that study that found 34.8% of respondents either didn't know removing the magazine would still allow the pistol to fire or said no. Mr. Tarrant admitted that only 28% of those respondents were in gun-owning households. So again, the study is flawed in that it did not focus on the correct population to sample. What is your position with regard to the settlement case? Well, the settlement, the only evidence that's in the record is a line or two in the testimony of Mr. Ray as the General Counsel of Beretta, in which he testified that they added a warning because it was a request of the plaintiff as part of a settlement. There is no testimony in the record that's cited as to any other reason for that. In fact, Mr. Ray testified that the same information is conveyed in the instruction manual in a number of different places. That's the sum total of the information they hope to use to create a tribal issue, and it simply is not there. I see my time is up. Thank you very much for your consideration. Thank you. Consolidated cases 105-789 and 105-851.